UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| CHARLES DOUGLAS PICKARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:13-CV-186-BG |
| | ) | ECF |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Plaintiff Charles Douglas Pickard seeks judicial review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and for supplemental security income benefits.  The United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings.  In accordance with the order of transfer, the undersigned now files this Report and Recommendation, recommending that the case be reversed and remanded.

## I.      Statement of the Case

On October 10, 2012, Pickard and a vocational expert testified at a hearing before an administrative law judge (ALJ).  Pickard was represented by an attorney at the hearing.  The ALJ determined on November 9, 2012, that Pickard was not disabled because he could perform jobs that exist in significant numbers in the national economy.  The Appeals Council denied review on June 20, 2013.  Following denial of a request for review, the ALJ's decision becomes the Commissioner's final decision and is properly before the court for review.  *Sims v. Apfel*, 530 U.S. 103, 107, 120 S.

Ct. 2080, 147 L. Ed. 2d 80 (2000); *see also Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005) (holding the Commissioner's final decision incorporates the Appeals Council's denial of a claimant's request for review).

## II.    Factual Background

Pickard claims that he became disabled on July 15, 2010, due to degenerative disc disease and chronic lower back pain.  (Tr. 15, 25–26.)  He claims that a prior back injury along with treatment in the form of a spinal cord stimulator implant limits his ability to work because he has difficulty sitting or standing for long periods of time.  (Tr. 197.)  He takes several medications including Hydrocodone, Zanaflex, Metoprolol, Trazodone, and Clonidine.  *Id.*  He is 6 feet, 1 inch tall, and he weighs 238 pounds.  (Tr. 118.)  He has a ninth grade education; he last worked in 2010 as a plumber's assistant; and he previously worked in various positions as a laborer.  (Tr. 101, 119, 198, 411, 414.)  He lives with his girlfriend, who takes care of the household chores.  (Tr. 78, 410.)

## III.    Standard of Review

A court reviewing the Commissioner's denial of disability insurance benefits is limited to determining (1) whether the decision is supported by substantial evidence in the record and (2) whether the Commissioner applied the proper legal standards.  *See* 42 U.S.C. § 405(g) (2014); *see e.g.*, *Higginbotham*, 405 F.3d at 335.  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).  Without reweighing the evidence or substituting its own judgment, a reviewing court must examine the entire record, including evidence favorable to the Commissioner as well as contrary evidence.  *See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If the Commissioner's findings are supported by

substantial evidence, they are treated as conclusive and will be affirmed. *See Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971).

## IV.   Discussion

Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).   In making a disability determination, the Commissioner conducts a five-step sequential evaluation to determine whether: (1) the claimant is currently working; (2) the claimant has a "severe impairment"; (3) the impairment meets or equals an impairment listed in Appendix 1 of the regulations; (4) the claimant is capable of performing past relevant work; and (5) whether the claimant, after taking into account age, education, previous work experience, and residual functional capacity, is capable of performing any other work. *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2013). If a disability determination is made at any step in the process, the finding is conclusive and the analysis terminates. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

At the first four steps in the analysis, the claimant bears the burden of proof. *Id.* Once this burden is satisfied, the Commissioner bears the burden of showing the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* After making such a showing, the burden shifts back to the claimant to rebut the Commissioner's finding. *See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

In this case, the ALJ determined: (1) Pickard was not currently engaged in substantial gainful activity; (2) Pickard's impairments—degenerative changes in his lumbosacral spine, enthesopathy,

3

thoracolumbar radiculitis and neuritis status post spinal cord stimulator implantation, obesity, status post injections to the hands, and hypertension—were severe in nature; and (3) Pickard did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 16.)  Following step three, the ALJ assessed Pickard's residual functional capacity (RFC) and found that he had the RFC to perform light work with the following limitations: the option to sit and stand at will during an eight-hour workday; only occasional climbing, balancing, and stooping; detailed and non-complex job tasks; and avoidance of constant handling.  (Tr. 20–21.)

At step four, the ALJ found that Pickard could not return to his past relevant work, which is classified under the regulations as heavy to very heavy depending on the position.  (Tr. 21.)  After considering testimony from a vocational expert and Pickard's RFC, age, education, and work experience, the ALJ concluded at step five—using the Medical-Vocational Guidelines as a framework—that Pickard was capable of performing other jobs that exist in significant numbers in the national economy.  (Tr. 22–23.)  Pickard argues on appeal that the ALJ erred by (1) failing to find that his impairments met or medically equaled a listed impairment and (2) failing to correctly assess his RFC.  Pl.'s Br. 28, 31.

**A.   Substantial evidence supports the ALJ's decision that Pickard does not meet the criteria for Listing § 1.04(A).**

Pickard argues that his medical conditions meet Listing § 1.04(A) for disorders of the spine. If an adult claimant is not working and his impairment meets or is equivalent to one of the listed impairments, a presumption of disability applies and the claimant qualifies for benefits without further inquiry into the claimant's age, education, and work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990); 20 C.F.R. §§ 404.1520(d), 416.920(d).

4

Diagnosis alone is insufficient to meet the requirements of a listed impairment.  *See Sullivan*, 493

U.S. at 530.  In order to meet or equal a listing, a claimant bears the burden of providing medical

findings that satisfy all of the stated criteria for that listing.  *Selders v. Sullivan*, 914 F.2d 614, 619

(5th Cir. 1990).

Listing § 1.04(A) requires: a disorder of the spine resulting in compromise of a nerve root

or the spinal cord along with "[e]vidence of nerve root compression characterized by neuro-anatomic

distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle

weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement

of the lower back, positive straight-leg raising test (sitting and supine)."  20 C.F.R. § 404, subpt. P,

app. 1 § 1.04(A).  In his assessment, the ALJ stated that he considered the neurological listings

generally and § 1.04 in particular as to Pickard's spinal impairments, and while he found that the

medical evidence established degenerative changes to Pickard's spine, he found no evidence of

compromise of a nerve root or the spinal cord as required by the listing.  (Tr. 16.)

 Pickard contends, however, that his diagnosis of thoracolumbar radiculitis is, by definition,

a disorder of the spine with swelling and pressure on the nerve root.  Pl.'s Reply Br. 2.  From March

2010 through July 2012, physicians consistently diagnosed Pickard with lumbar radiculitis.  (Tr.

173, 181, 186, 191, 215, 227, 262, 269.)  Radiculitis, or radiculopathy, is defined as a disorder of

the spinal nerve roots.  Stedman's Medical Dictionary 1622 (28th ed. 2006).  In this regard,

Pickard's diagnosis may meet the initial requirements of the listing.  But in addition to a disorder

of the spine resulting in compromise of the nerve root or the spinal cord, the listing requires

evidence of nerve root compression characterized by (1) neuro-anatomic distribution of pain; (2)

limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness)

5

accompanied by sensory or reflex loss; and (4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).  *See* Listing § 1.04(A).  Pickard contends that his medical record provides evidence that he meets all of the above-listed criteria.  *See* Pl.'s Reply Br. 2–4.

In regard to neuro-anatomic distribution of pain, Pickard points to his extensive treatment history at the Texas Tech Physicians of Lubbock International Pain Center (pain center).  Pickard sustained a work-related injury to his back in 1996, and he was referred to the pain center in 1999 after he fell and re-injured himself.  (Tr. 328.)  At that time, he stated that he was experiencing pain in his back with some radiation to the right lower leg and foot.  *Id.*  On November 17, 2000, Pickard demonstrated paraspinal region low back pain and right hip pain with a positive Kemp's test, which assesses the lumbar spine facet joints in order to detect pain.  (Tr. 332.)  He was diagnosed with bilateral lumbar facet anthropathy, suggesting degenerative changes to the facet joints of the spine, and possible discogenic back pain.  (Tr. 332, 336.)  The physician noted, however, that Pickard had no change in sensation of motor function since the last visit—during which his motor sensation and reflexes were intact with no gross sensory deficits.  *Id.*

Pickard expressed the desire to undergo aggressive treatment and was scheduled for a dual dorsal column stimulator implantation in 2000.  (Tr. 197, 332, 336.)  He testified that after the initial implantation of the spinal cord stimulator (SCS), the battery was replaced in 2008 and a new stimulator system was put in some time afterward.  (Tr. 407–08.)  The records show that the single lead was fractured, and a new dual-lead stimulator was implanted in June 2009.  (Tr. 143, 149–51, 290.)  Pickard reported a 50 percent reduction in pain after SCS revision procedures in June and September of 2009.  (Tr. 145, 151)  Pickard relied upon the SCS for pain relief and continued to

6

have neurostimulator reprogramming sessions in 2010 and 2011. (Tr. 176, 223.)  He testified at the hearing before the ALJ that his lower extremity weakness had spread over time from one side of his body to the other side and the SCS was no longer as effective; however, he reported during an examination on July 19, 2012, that the SCS continued to provide relief. (Tr. 267, 407–08.)

Pickard next contends that his medical records demonstrate limitation of motion of his spine. Pl.'s Reply Br. 3.  In support, he points to a consultative exam performed on March 26, 2011, by Joy Tenpenny, M.D. (Tr. 197–201.)  At the exam, Pickard reported his primary symptom as back pain that radiates into his bilateral lower extremities, exacerbated by sitting or standing. (Tr. 197.)  Dr. Tenpenny found Pickard's range of motion was decreased as follows: "Shoulders: forward elevation 100 degrees bilaterally; Thoracolumbar: extension 20 degrees bilaterally, lateral flexion 20 degrees bilaterally, rotation 20 degrees bilaterally," but his range of motion was within normal limits in all other areas. (Tr. 200.)  Lumbar spine x-rays taken the same day found partial sacralization of the L5 vertebral body; disk space narrowing and endplate changes seen at L5-S1; and minor anterior wedging deformity seen involving the T11 vertebral body. (Tr. 202.)  Other than the consultative examination, Pickard does not cite to additional medical evidence in support of his contention that he experiences limitation of motion of the spine.

In regard to motor loss accompanied by sensory or reflex loss, Pickard refers to evidence of lower extremity weakness.  Pl.'s Br. 30, Pl.'s Reply Br. 3–4.  For example, during an exam on January 26, 2012, Pickard was found to have some lower extremity weakness associated with numbness to the feet. (Tr. 250–53.)  He reported walking with a cane, but he was noted as having normal range of motion and normal sensory processing. (Tr. 250–51.)  During an exam on July 19, 2012, Pickard complained of worsening right lower extremity strength, and his strength was listed

as 4/5 upon physical examination. (Tr. 267–69.) At the same exam, he denied difficulty with concentration, disturbances in coordination, numbness, falling down, tingling, or brief paralysis. (Tr. 268.) Additionally, the clinician found no focal deficits. (Tr. 269.)

As to reflex loss, during the consultative exam Dr. Tenpenny reported reduced reflexes of 1+/1+ bilaterally—symmetric in biceps, brachioradialis, patellar, and Achilles distribution. (Tr. 200.) The deep tendon reflexes are graded on a scale of 0–4+. <u>Clinical Methods: The History, Physical, and Laboratory Examinations</u> 365 (H. Kenneth Walker et al. eds., 3d ed. 1990.) A score of 1+ (a slight but definitely present response) may or may not be normal, while a score of 2+ (a brisk response) is considered normal.[1] *Id.* Asymmetry of reflexes provides another indication of abnormality; here, Pickard's reflexes were symmetric throughout. *Id.*; (Tr. 17, 200.) Although Pickard points to evidence of worsening lower extremity weakness and reduced reflexes, the record does not support sustained and consistent findings of "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." *See* Listing § 1.04(A).

Finally, when there is involvement of the lower back, the listing criteria requires evidence of positive straight-leg raising tests, both sitting and supine. During the consultative exam, Pickard's straight-leg test was positive at 30 degrees bilaterally secondary to lower back pain; however, Dr. Tenpenny noted that Pickard was able to bend at the hips at a 90 degree angle when she dropped her pen, which was not congruent with his 30 degree results. (Tr. 200–01.) In addition, Dr. Tenpenny found that Pickard's muscle strength was intact at 5/5 in all areas. (Tr. 199.) She noted that he had a slow, unsteady gait, but he did not use an assistive device. *Id.* Pickard contends

---

[1] "Whether the 1+ and 3+ responses are normal depends on what they were previously, that is, the patient's reflex history; what the other reflexes are; and analysis of associated findings such as muscle tone, muscle strength, or other evidence of disease." <u>Clinical Methods</u>, at 365.

that his medical record demonstrated years of positive straight-leg tests. Pl.'s Reply Br. 4. The record shows consistent positive Kemp's tests, which suggest the presence of lower back pain. (Tr. 163, 251, 332, 336, 360, 365, 366.) For straight-leg raising tests in particular, the record is not as clear. His straight-leg raises were listed as "marginally positive on the right side" twice and bilaterally positive once—both in early 2000, and an exam on January 30, 2009, revealed positive straight-leg raises on the right side. (Tr. 163, 360, 365–66.)

Although Pickard demonstrates symptoms that coincide with the criteria of Listing § 1.04(A), the evidence does not affirmatively establish that he meets or equals the listing. On the contrary, substantial evidence supports the ALJ's finding that Pickard did not meet the requirements. "An impairment that manifests only some of [the listed] criteria, no matter how severely, does not qualify." *See Sullivan*, 493 U.S. at 530–35 (noting the Commissioner explicitly set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard). Besides the inconsistency during his consultative examination, Pickard's medical records do not otherwise reveal similar inconsistencies or evidence of malingering. Pl.'s Br. 30. Pickard's history of back pain, lower extremity weakness, and treatment through SCS implantation, however, does not automatically establish his qualification for a listed impairment.

**B.      The ALJ erred in failing to consider the functional limitations imposed by Pickard's implanted spinal cord stimulator and associated pain management treatment in his RFC assessment.**

Pickard next claims that the ALJ erred by not including all of his limitations while assessing his RFC. Pl.'s Br. 31. Specifically, he contends that the ALJ failed to consider any limitations and restrictions imposed by his implanted spinal cord stimulator and associated pain management treatment. Pl.'s Br. 32. He directs the court to literature published by the manufacturer of the spinal

cord stimulator, which cautions against activities that could damage or break the stimulator leads, such as bending, twisting, bouncing, or stretching, as well as exposure to certain electronic fields. Pl.'s Br. 33.  He contends that the repetitive movements required by the restricted light jobs designated by the ALJ could jeopardize his spinal cord stimulator lead placement and the efficiency of pain management.  Pl.'s Br. 34.  Pickard claims that by excluding the above-described restrictions imposed by his spinal cord stimulator, the ALJ failed to accurately assess his RFC.  Pl.'s Br. 34.  In determining RFC, the ALJ must consider the limiting effects of all the claimant's impairments, even those that are not severe.  20 C.F.R. §§ 404.1545(e), 416.945(e).

The Commissioner contends that the medical records do not reflect that Pickard's physicians directly limited his activities as a result of his implanted stimulator.  The record reveals, however, that Pickard's stimulator required regular reprogramming and revisions for battery failure and fractured stimulator leads.  (Tr. 163, 176, 290, 299, 320–21.)  Significantly, Pickard continued to complain of pain that was not directly alleviated by the stimulator throughout his course of treatment.  On November 23, 2010, Pickard noted that his stimulator covered his legs, but not the pain in his lower back.  (Tr. 172.)  In February of 2011, Pickard stated that the stimulator helped with some of his back and legs, but he complained of a consistent, sharp pain in his back that radiated down the front of his legs.  (Tr. 236.)  He described "feel[ing] like [his] back will break," and the pain was listed as 10/10.  *Id.*  In the month prior to a reprogramming session in August 2011, Pickard stated that he had pain in his right thigh and knee, and he could feel the stimulator greater on his left side.  (Tr. 219, 223.)

On October 27, 2011, a clinician noted that although Pickard was stable on his medication regime, he continued to have midline lower back pain, and he was currently awaiting approval for

10

interspinal ligament injections. (Tr. 214.) On January 26, 2012, Miles Day, M.D., reported that the clinic was not able to cover the central portion of Pickard's lower back with the stimulator, and worker's compensation had rejected his requests for interspinous injections. (Tr. 250.) Dr. Day described Pickard's course as "worsening." *Id.* Pickard testified at the hearing before the ALJ in October 2012 that the stimulator helped at the start, but his other side had weakened and he experiences numbness in his legs and continued pain despite adjusting the stimulator to the highest level. (Tr. 407–09.)

Despite acknowledging Pickard's desire to increase stimulator coverage to his lower back and his testimony of ongoing pain even with the stimulator set as high as possible, the ALJ determined that Pickard's pain was stable and well controlled with the stimulator and medications. (Tr. 19.) In doing so, the ALJ failed to specifically consider how the limitations imposed by Pickard's spinal cord stimulator and associated pain management regimen would affect his ability to perform basic work activities. When assessing RFC, the adjudicator must "consider all allegations of physical and mental limitations or restrictions." *Id.* Because the record shows that the complications surrounding Pickard's stimulator would likely have more than a minimal effect on his ability to perform sustained work, the ALJ should have provided an appraisal of the limitations imposed by Pickard's implanted spinal cord stimulator in his RFC assessment.[2] For this reason, substantial evidence does not support the ALJ's RFC determination, and the case should be remanded for further administrative proceedings.

---

[2] Based on all of the relevant evidence of records, the RFC assessment considers various factors including: medical signs and laboratory findings as well as "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medications)." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

## V.    Recommendation

For the foregoing reasons, the undersigned recommends that the United States District Court reverse the Commissioner's decision and remand for further administrative proceedings.

## VI.    Right to Object

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy.  28 U.S.C. § 636(b)(1) (2014); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to timely file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated:        June 11, 2014.

NANCY M. KOENIG
United States Magistrate Judge

12